## KRAMER v. MILLS LUMBER CO.

Circuit Court of Appeals, Eighth Circuit.
February 20, 1928.

No. 7635.

1. Negligence ⬉27—Lumber company, furnishing timbers of dimensions and grade specified, was not responsible to purchaser's employee for sufficiency of timber to support scaffold.

Where steel company purchased timber for support of scaffold, specifying dimensions and grade of lumber desired, and had determined position in which it was to be placed and burden it was to bear, lumber company, furnishing timber of dimensions requested, was not responsible to purchaser's employees using scaffolding for sufficiency of timber in place where it was to be used.

2. Negligence ⬉121(2)—Breaking of timber supporting scaffold did not alone prove negligence of lumber company as to deceased employee of purchaser.

Occurrence of accident causing death by breaking of a timber, which supported a high scaffold on which deceased was working, held not of itself to prove negligence of lumber company furnishing timber to deceased's employer.

3. Negligence ⬉136(8)—In action against lumber company for death from breaking of timber supporting scaffold, withdrawal of case from jury held proper where evidence disclosed conditions for which defendant was not responsible.

In action against company furnishing timber for support of scaffolding, on account of death of employee when timber support broke, refusal of court to submit case to jury was proper, under evidence which showed insufficient thickness of timbers, existence of spike knots, "shakes" in timber, and surface resin, any of which conditions might have produced injury, where it was not shown that lumber company was responsible for all such conditions.

4. Evidence ⬉19—Required strength of girders and joists for long unsupported span is not matter of common knowledge.

Strength needed in girders to carry known weights in case of bridge, or joists or rafters upholding floor, where span is long and unsupported, is not a matter of common knowledge, but belongs to the field of experts.

5. Evidence ⬉66—It is not presumed lumber dealers know breaking limit of all kinds of lumber in which they deal.

Court will not assume that lumber dealers, from the nature of their business, know breaking or crushing limit of all sizes and kinds of lumber in which they deal, as against thrusts of known forces in whatever position timbers may be placed.

6. Negligence ⬉136(16)—Absence of evidence of defendant lumber company's knowledge of danger in using lumber for support of scaffold held to warrant withdrawal of death action from jury.

In action against lumber company, furnishing timbers for support of scaffold, to recover for death of employee killed when supporting timber broke, withdrawal of case from jury *held* proper, where there was no evidence that defendant, as a dealer in lumber, should·have had knowledge of danger in proposed use, or of the breaking strength of timbers furnished, there being no presumption that lumber dealers know breaking or crushing strength of all sizes of lumber in which they deal.

In Error to the District Court of the United States for the Eastern District of Missouri; Charles B. Davis, Judge.

Suit by Rosia Kråmer against the Mills Lumber Company. Judgment for defendant was entered on a directed verdict, and plaintiff brings error. Affirmed.

Rendlen & White, of Hannibal, Mo., for plaintiff in error.

Paul D. Higbee, of Lancaster, Mo., and M. D. Campbell, of Kirksville, Mo. (Higbee & Mills, of Lancaster, Mo., on the brief), for defendant in error.

Before KENYON and BOOTH, Circuit Judges, and MUNGER, District Judge.

MUNGER, District Judge. This case presents the question whether the trial court erred in directing a verdict for the defendant at the conclusion of the plaintiff's evidence. The parties will be designated as in the court below.

The plaintiff sued to recover for damages caused her by the death of her·husband, Abe Kramer. He was killed at La Plata, Mo., by the breaking of a timber supporting a high scaffold on which he was working, causing him to fall to the ground. ·At that time he was employed by the Pittsburgh-Des Moines Steel Company. The steel company was then engaged in erecting at La Plata a steel water tank, which was supported˙ at a height of about 125 feet above the ground by a tower having four columns of steel. The steel company by its employés, including Mr. Kramer, erected the scaffold. This suit was brought against the defendant, a lumber company that furnished the piece of timber which broke and caused the accident. The steel company, acting by Mr. Kramer, had purchased this and three other similar pieces of timber from the defendant. The plaintiff's petition alleges that, before ordering the timbers, Mr. Kramer explained to the defendant the use to be made of these timbers in building the scaffold, stated that he and other workmen would be employed upon it, with their tools and equipment, and that timbers were required of fresh, clear, strong, and sound stock, 6 inches in width by 6 inches in thickness, and of 20 feet in length. It

further alleges that the defendant agreed to furnish such timbers, but, instead of furnishing them, negligently, knowingly, and deceitfully furnished unsound timbers, not of the quality ordered, and unfit and inherently dangerous for the purposes for which they were to be used, as the defendant well knew, and that, as a result of such inferior quality, the timber broke and caused the accident.

The answer of the defendant denied any negligence on its part. The evidence shows that Mr. Kramer, for the steel company, ordered from the defendant four timbers, "6x6x20," and that by trade usage, this meant timbers 20 feet long, 5½ inches in width, and 5½ inches in thickness. The defendant did not have such timbers in stock, but promised to procure them. Mr. Kramer explained to the defendant a purpose to use these and two similar timbers that it had, in constructing a platform 112 feet above the ground and beneath the water tank. Upon this platform Mr. Kramer and other workmen would be supported while riveting together sections of the steel tank. It was explained that two of the timbers would be used as supports for the platform, one to be placed at the east side and one at the west side of the tower, and these timbers would each be attached by chains to the upright columns of the tower. The chains were to be placed around the timbers about 18 inches from the ends, and this would leave an unsupported span of about 17 feet. Across these girders (referred to in the testimony as needle beams) the other four timbers were to be placed, and over these was to be placed a floor of planks. It was stated that there would be five men on the platform, two or three kegs of rivets, a forge, coal for the forge, and tools.

The defendant was informed by Kramer that "good, clean, and sound" timbers were desired, of "new stock, clean timber, suitable for scaffolding"—"good stock, strong timbers, and suitable for the purpose, as our lives depended upon it." A suggestion is made that there is no proof that the timbers were delivered by the defendant, but in view of the admissions in the answer, as applied to the testimony, the suggestion does not require further notice.

At the trial a witness arranged six small wooden sticks to represent the mode in which the timbers were placed in this scaffold when it was built. Much of the testimony refers to this exhibit. The exhibit is not a part of the record, and without it a large part of the testimony is indefinite. It appears that two of the crosspieces were near the center of the girders, but the exact position of the four crosspieces cannot be ascertained. The flooring embraced planks of 2 inches in thickness, and some of 1 inch—some of a length of 14 feet and some of a length of 12 feet. The width of the floor is not known. The weight of the crosspieces and of the flooring is also unknown. The girder on the west side broke near the center, and this caused the whole platform, supported by it, to fall to the ground. Just before the fall, two of the men were standing somewhere towards the center of the platform on the western portion of it, and one man stood by a forge at a corner of the platform near a column. Some coal and coke, tools, and a ladder also rested on the platform. The total weight on the scaffold was between 2,500 and 2,700 pounds.

At the trial the plaintiff produced a portion of the timber which broke and caused the accident. Much of the testimony refers to it. It was offered in evidence and received as an exhibit. It was not brought up to this court, and its absence makes it difficult to get a clear understanding of the quality of the timber which the defendant furnished. It appears that at the trial a portion of this timber measured 5½ inches in width by 5¼ or 5⅜ inches in thickness. There does not appear to have been any testimony that the order for the timbers specified that it should be of No. 1 grade, but there was much testimony to show that this exhibit was not of that grade. There was no testimony that "clear" timber was ordered, but much testimony was given that the exhibit was not of "clear" timber. There was testimony that the exhibit was not sound, and as reasons why it was not sound, or was not of No. 1 grade, witnesses specified the existence of one or more "spike knots," one of them where the break in the wood occurred, other knots too close together, "shakes," an appearance of resin, and a checked or rechecked surface.

The plaintiff concedes that the action is not one for a breach of contract. See Standard Oil Co. v. Murray (C. C. A.) 119 F. 572, 575; S. H. Kress & Co. v. Lindsey (C. C. A.) 262 F. 331, 333, 13 A. L. R. 1170.

[1] There was no evidence of any intentional wrong on the part of the defendant or of any fraud or concealment. The real questions are whether the defendant was guilty of negligence, and, if it was guilty, then a question would arise whether this negligence was of such a nature that the defendant is responsible therefor in an action by the widow of an employé of the corporation to which the lumber was sold. Counsel have presented theories of the liability to a third person for

negligence by a vendor in supplying goods sold for a known purpose, as stated in Huset v. J. I. Case Threshing Machine Co. (C. C. A.) 120 F. 865, and many other cases; but the first question that arises in this case is whether there was any sufficient proof of the defendant's negligence. There was no evidence that the defendant had actual knowledge that the piece of timber would be dangerous to men working on the platform. The inquiry remains whether the defendant exercised the care that a reasonably prudent man would have used under the circumstances. Ought the defendant to have inspected the timbers sold, and would it have learned from such inspection, that it would be dangerous for the known use to be made of it?

The responsibility for the sufficiency, in the place where it was to be used, of a timber of the size known as 6 by 6 inches by 20 feet, and of the grade ordered, did not rest upon the defendant, because the purchaser had specified the dimensions and grade of lumber, and had determined the position in which it was to be placed and the burden it was to bear. The only testimony given to prove that such a timber as had been ordered would have been sufficient to have carried the load placed upon it is found in the following question and answer (referring to the piece of lumber then in court): "If that was a No. 1 timber, or clear, sound, fresh stock, a 6x6, 20 feet in length, would it be sufficient as a needle beam, with a 17-foot span, supporting weight of 3,500 to 4,000 pounds?" Answer: "In my opinion, yes, sir." If this answer is to be considered as relating to a timber such as was ordered, notwithstanding its hypothesis of a No. 1 timber, or one of clear stock (for which there was no foundation in the proofs), the answer does not show that the timber ordered would have been safe for the load which was carried at the time of the accident. The question and answer did not embrace essential engineering and mechanical principles. They did not consider whether the supposed load was evenly distributed over the length of the timber, or was unevenly distributed, or was concentrated. They did not consider whether the load was a dead or a live load. They did not consider the placing of a load such as actually existed on the timber which broke. This testimony was ambiguous and uncertain, and afforded no basis for the jury to determine, except by mere speculation, whether the timber ordered would have avoided the accident.

[2, 3] Independently of the question whether or not a timber such as was ordered would have broken, there is no sufficient evidence to show what caused the break in the timber that was used, or that defendant ought to have known of all defects that are now claimed to have been in it. There was testimony that at the time of trial the piece of timber produced in court was of No. 2 grade. Witnesses stated that it was unsound and did not grade No. 1 because (1) it measured 5½ inches by 5¼ or 5⅜ inches in thickness, whereas a 6x6-inch timber should measure 5½x5½ inches; (2) it contained one or more "spike" knots, extending the full width of the timber, and the break in the timber started where one of these knots was; (3) there were other knots too close together, and one knot was too large in diameter; (4) there were "shakes" in the timber; (5) resin appeared on its surface. Spike knots were described as knots caused by sawing off a limb not at a right angle. Shakes were described as an opening of the grain, caused by the rapid growth of the tree. There was no testimony, such as is usually of assistance, when given by qualified witnesses, in determining questions of the sufficiency of the article (United States Smelting Co. v. Parry [C. C. A.] 166 F. 407, 410; Central Coal & Coke Co. v. Williams [C. C. A.] 173 F. 337, 339; Gila Valley R. R. Co. v. Lyon, 203 U. S. 465, 474, 27 S. Ct. 145, 51 L. Ed. 276), that one or more or all of these things made the timber unsafe for the use to which it was put.

It cannot be determined, at least in the absence of the exhibit, that the trial court may not have properly concluded that the location or amount of the existing resin, or of the shakes, was of no consequence in considering the safety of the timber for the use made of it. There was much testimony that any number of knots was permissible in grading such timber as No. 1, provided the knots were sound, not too close to each other, and were not spike knots. There was no testimony that the spike knots appearing in the exhibit at the time of the trial were such that they would have been discovered as spike knots if an inspection had been made when the timber was delivered; nor was there any testimony that the appearance of resin or shakes would have been discovered at that time. From the testimony it may be inferred that an inspection would have disclosed the facts that the timber was 5¼ or 5⅜ inches in thickness instead of 5½ inches, that the diameter of one or more of the knots was greater than an inch and a half, and that some of the knots were too near to each other, and therefore the timber was not of No. 1 grade, but there was no testimony that any one or

more of these qualities made the timber unsafe for the use to which it was put. The happening of the accident was not proof of the negligence of the defendant, and if the accident might have been attributed to some of the defects disclosed by the evidence, the trial court was justified in refusing to submit the case to the jury under the principle of the rule announced in Patton v. Texas & Pacific Railway Co., 179 U. S. 658, 663, 21 S. Ct. 275, 277 (45 L. Ed. 361):

"And where the testimony leaves the matter uncertain and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion. If the employé is unable to adduce sufficient evidence to show negligence on the part of the employer, it is only one of the many cases in which the plaintiff fails in his testimony and no mere sympathy for the unfortunate victim of an accident justifies any departure from settled rules of proof resting upon all plaintiffs."

[4-6] There was no error in the trial court's ruling for another reason. If the defendant had known that the timber had the defects now claimed, there is no evidence that a dealer in timber, such as the defendant was, ought to have known that it was dangerous for the proposed use. The defendant was informed that four of these timbers would be placed across the two girders, but it was not informed where they would be placed, nor what would be the size or weight of the platform, in addition to the weight of the men and tools. If those facts had been known, yet the plaintiff's claim rests upon the assumption that a jury may infer that a dealer in lumber had knowledge of the weight that will break the lumber that he sells. The strength of such materials is primarily a question for engineers or architects. The strength needed in girders to carry known weights as in the case of a bridge, or in the case of joists or rafters upholding floors or roofs, where the span is long and unsupported, is not a matter of common knowledge, but belongs to the field of experts.

As has been stated, there was no evidence of any actual knowledge by the defendant of the danger. No prior study or experiences gave it notice. The dealer did not keep the timbers in his stock, and had to order them shipped from a dealer in another town or city. The timbers were delivered to the purchaser and were piled near the work for three or four days before they were used and this girder was safely uesd by Kramer and the other men for three days before it broke. There was no evidence that the breaking strength of such timbers is generally known among dealers in lumber. It would be an unwarranted and an unreasonable assumption that such dealers from the nature of their business are presumed to know the breaking or crushing limit of all the sizes and kinds of lumber in which they deal, however the timbers may be placed, and as against thrusts of any known force or direction.

For the reasons stated, it appears that there was no sufficient proof of negligence of the defendant, and this conclusion makes it unnecessary to consider other questions presented.

The judgment will be affirmed.